## FRANK NESBITT v. THE STATE.

### No. 3351. Decided December 16, 1914.

**1.—Assault to Murder—Evidence—Expert Testimony.**

Where, upon trial of assault to murder, two physicians who had made an examination of the party injured, and were permitted to testify that from an examination of the wounds upon the head of said party and from their experience and observation as physicians and surgeons, the weapon used in inflicting the wounds from the mode and manner in which it was used, was one calculated to produce death or serious bodily injury, there was no reversible error. Following Waite v. State, 13 Texas Crim. App., 169, and other cases.

**2.—Same—Self-defense—Charge of Court—Requested Charge.**

Where, upon trial of assault to murder, there was nothing in the evidence to suggest prior threats or conduct on the part of the party injured that would cause defendant to believe he was in danger of death or serious

bodily injury, and his act of self-defense was based on the acts and conduct of the party injured at the time, which issue the court submitted in a proper charge on self-defense, there was no reversible error in refusing a requested charge on that issue.

Appeal from the District Court of Knox. Tried below before the Hon. Joe A. P. Dickson.

Appeal from a conviction of aggravated assault; penalty, a fine of $300 and sixty days confinement in the county jail.

The opinion states the case.

No brief on file for appellant.

*C. E. Lane,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was prosecuted under an indictment charging him with assault to murder, and when tried was convicted of aggravated assault.

The evidence would show that trouble arose between appellant and the prosecuting witness, Bud Sessions, over some harness. Sessions had gone to the barn of appellant and took the harness during appellant's absence, and they had some words about the matter over the telephone. On the day of the difficulty Sessions was at work on the same farm on which appellant rented land, and when he got through his work he drove across appellant's wheat land in going to the home of Mr. Ludwick, for whom Sessions was at work, and on the way he went by the lot of appellant. The State's contention is, that when Sessions got even with the lot, appellant approached his wagon and told Sessions he did not want him to come across his land, when Sessions replied he would be compelled to do so; that appellant then commenced cursing Sessions, and told him if he would get out of the wagon he could and would whip him. As Sessions started to get out of the wagon, with his back to appellant, appellant struck him on the head with a stick or scantling, knocking him senseless.

Appellant's version is as follows: That when Sessions came by his lot he said to him: " 'There is a road plum around this place.' I says, 'I have forbid you twice before to come on this premises,' and I was walking as I talked. I says, 'There is a road plum around this place, and I forbid you to come on these premises twice before.' I says, 'I want you to get out in this road and stay out.' By that time I was even with him. I turned my back to walk in this gate, and he stopped his team and commenced getting out of the wagon; he got over the front wheel of the wagon; when he stopped his team he wound his lines upon the front stub of the wagon, and commenced to get out of the wagon; it was turned in a northwest direction. I was going in this lot to feed my hog. He says, 'I will get off of this place when I get ready and I will come back when I get ready, just to show you I am not afraid.' When he did that I turned around, went back towards him, when he come off of the wagon he run his left hand in his pocket first,

then his right hand; then I seen this stick and grabbed it and got to him as quick as I could; if I had not seen the stick I would have run. I was sure he had a knife, because he had been heading maize. I hit him on the head with the stick."

Dr. W. M. Taylor testified: "Mr. Sessions, Dr. Heard and Mrs. Sessions went with me out to him, when we got there we took him out of the wagon, and Mr. Sessions stayed on the back seat of the car and held him until we got to Goree; when I found him he was in an unconscious condition, vomiting some. I did not make a thorough examination of him then; we carried him home just as soon as we could; afterwards I made an examination of him and Dr. Heard assisted me; we made the examination as soon as we got him home and got him in bed and cleaned up as much as we could. We found two cut places on his head; we clipped his hair from around those places, washed them, sewed them up, took two stitches in one and one in the other. We found those wounds here (indicating) on the left side between the frontal bone and the parietal, on the left side of the head across this way (indicating); it was a little gag there; we found one here on top across that way (indicating), this was cut through the scalp, upper margin of the wound extended out to a scratch lower part, we took one stitch in the upper part of this wound (indicating), this side of the head (indicating) was bruised, we did not do any more than we had to that night and awaited developments. The next morning on this side of the head, the part of the scalp over the right parietal bone come down to the occipital septa, just a little over the center of what we call the parietal septa junction, between the two parietal bones; this swelling extended around this line; you can see where I shaved his head there around this way (indicating) something like. Then there was a fluctuating mass here in around on the frontal bone to the right of the center, one corresponding on the opposite side—a long, fluctuating mass. These bruises I have testified about, they were separate and distinct from each other. I clipped his hair Sunday so I could tell more about these places. I kept his head wrapped in hot clothes until Monday to see if I could reduce some of the swelling, but the swelling increased instead of going down. I wanted to make out as near as I could the nature of the mass so I used an asperating needle on this mass here. I run the needle inside, drawed it out and it was pure blood. I took about two ounces out of that wound, that was just a fluctuating mass; I did not open this over here (indicating) until the following day, he complained a good deal of his eyes, could not bear the light, so I opened these two in front and that relieved the eye strain. I took about an ounce each out of the two wounds in front. I opened those up every day. I opened them one day and they would fill up by the next. In my opinion there was at least three distinct wounds upon his head that gave the trouble, there was two cut places on his head, one here and one here (indicating). This mass here (indicating) that contained the fluid beneath come up to a line of this wound here. I tried to drain it through this and could not, so I had to cut an opening here (indicat-

ing). I drained the one on top through this wound (indicating), but I run my knife under there and run it about two inches towards the mass here, drained some from there, rather than to cut longer places. The wound and bruise I have described there on the back of his head, on the right, in my opinion I do not think a man could stand in front of him and have inflicted that wound with a stick, he would have had to have been to the side of him or to the back. From the examination of the wounds upon the head, of the person, and from my experience and observation as a physician and surgeon, I would say that the weapon used in the inflicting of the wounds, from the mode and manner of its use, was a weapon calculated and likely to produce death or serious bodily injury, in my opinion. I considered the wounds upon Bud Sessions' head serious wounds." It is shown that Sessions remained unconscious for several days.

Dr. Heard's testimony was, in substance, the same as Dr. Taylor's. Two bills of exception were reserved to a portion of Dr. Heard's and Dr. Taylor's testimony; that portion wherein they were permitted to testify that from an examination of the wounds upon the head and from their experience and observation as physicians and surgeons the weapon used in inflicting the wounds, from the mode and manner of its use, was a weapon calculated to and likely to produce death or serious bodily injury. While the evidence does not disclose they ever saw the weapon used, yet they did see and examine the wounds inflicted, and under the circumstances shown by this record we do not think there was any error in permitting them to so testify. Waite v. State, 13 Texas Crim. App., 169; Banks v. State, 13 Texas Crim. App., 182; Powell v. State, 13 Texas Crim. App., 244; Henry v. State, 49 S. W. Rep., 96; Sebastian v. State, 41 Texas Crim. Rep., 248.

On the issue of self-defense, as made by the testimony offered in behalf of appellant, the court instructed the jury: "Upon the law of self-defense you are instructed that if from the acts of the said Bud Sessions, or from his words coupled with his acts, there was created in the mind of the defendant a reasonable apprehension that he, the defendant, was in danger of losing his life or of suffering serious bodily injury at the hands of the said Bud Sessions, then the defendant had the right to defend himself from such danger or apparent danger as it reasonably appeared to him at the time, viewed from his standpoint. And a party so unlawfully attacked is not bound to retreat to avoid the necessity of assaulting his assailant. If you believe that the defendant committed the assault as a means of defense, believing at the time he did so, if he did do so, that he was in danger of losing his life or of serious bodily injury at the hands of said Bud Sessions, then you will acquit the defendant."

In this record there is nothing to suggest prior threats or conduct on the part of Sessions that would cause appellant to believe he was in danger of death or serious bodily injury—his right to act in self-defense must be based on the acts and conduct of Sessions at that time. He admits he ordered Sessions to get off his land and stay off; he says

Sessions replied he would not do so, and got out of his wagon and started towards him, running his hand in his pocket, and he believed he was going after a knife. He does not claim that Sessions drew a knife, but as he, Sessions, had been cutting maize heads that evening, he knew he had a knife, and he believed when he ran his hand in his pocket that it was his purpose to draw a knife and use it on him, when he struck with a stick, knocking Sessions senseless. The sole question is, did the above paragraph of the charge sufficiently present this defense? We are inclined to think it does do so, and there was no reversible error in refusing the special charge requested on that issue.

The judgment is affirmed.

*Affirmed.*